UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

DONIELLE C.,

      *Plaintiff,*

                                           Case No. 1:24-cv-13469

*v.*

                                           Patricia T. Morris

COMMISSIONER OF SOCIAL
SECURITY,
                                           United States Magistrate Judge

      *Defendant.*

_____/

## MEMORANDUM OPINION AND ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 9, 11)

## I.    CONCLUSION

Plaintiff Donielle C.'s motion for summary judgment will be **DENIED** (ECF No. 9), Defendant the Commissioner of Social Security's motion for summary judgment will be **GRANTED** (ECF No. 11), and the final decision of the Administrative Law Judge (ALJ) will be **AFFIRMED**.

## II.    ANALYSIS

### A.    Introduction and Procedural History

On December 30, 2022, Plaintiff applied for Disability Insurance Benefits and Supplemental Security Income, alleging she became disabled on December 1, 2022, at which time she was 48-year-old. (ECF No. 7-1, PageID.46, 58). The

Commissioner initially denied the applications on June 2, 2023, and on reconsideration on September 12, 2023. (*Id.*). Plaintiff then requested a hearing before an ALJ, which was held on July 25, 2024. (*Id.* at 46, 66–84). The ALJ issued a written decision on August 5, 2024, finding Plaintiff was not disabled. (*Id.* at PageID.43–65). Following the ALJ's decision, Plaintiff requested review from the Appeals Council, which denied her request on November 4, 2024. (*Id.* at PageID.30–34).

Following the Appeals Council's denial of review, Plaintiff sought judicial review on December 27, 2024. (ECF No. 1). The parties consented to the Undersigned "conducting any or all proceedings in this case, including entry of a final judgment and all post-judgment matters." (ECF No. 13). Before the Court are the parties' cross-motions for summary judgment (ECF Nos. 9, 11) as well as Plaintiff's response to the Commissioner's motion (ECF No. 12).

## B. Standard of Review

District courts have jurisdiction to review the Commissioner's final administrative decisions pursuant to 42 U.S.C. § 405(g). The review is restricted solely to determining whether "the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x 502, 506 (6th Cir. 2014) (citation modified). Substantial evidence is "more than a scintilla of evidence but

less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (citation modified). "[T]he threshold for such evidentiary sufficiency is not high." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citation modified).

A district court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). Courts will "not try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). "If the [Commissioner's] decision is supported by substantial evidence, it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* (citation modified).

### C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve

months." 42 U.S.C. § 1382c(a)(3)(A).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, [the ALJ] consider[s] [the claimant's] work activity, if any. If [the claimant is] doing substantial gainful activity, [the ALJ] will find that [the claimant is] not disabled.

> (ii) At the second step, [the ALJ] consider[s] the medical severity of [the claimant's] impairment(s). If [the claimant] do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, [the ALJ] will find that [the claimant is] not disabled.

> (iii) At the third step, [the ALJ] also consider[s] the medical severity of [the claimant's] impairment(s). If [the claimant has] an impairment(s) that meets or equals one of [the] listings in appendix 1 of this subpart and meets the duration requirement, [the ALJ] will find that [the claimant is] disabled.

> (iv) At the fourth step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . past relevant work. If [the claimant] can still do . . . past relevant work, [the ALJ] will find that [the claimant is] not disabled.

> (v) At the fifth and last step, [the ALJ] consider[s] [his or her] assessment of [the claimant's] residual functional capacity and . . . age, education, and work experience to see if [the claimant] can make an adjustment to other work. If [the claimant] can make an adjustment to other work, [the ALJ] will find that [the claimant is] not disabled. If [claimant] cannot make an adjustment to other work, [the ALJ] will find that [the claimant is] disabled.

20 C.F.R. § 404.1520(4); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing his or her RFC, which "is the most [the claimant] can still do despite [his or her] limitations," and is assessed using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 214 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined Plaintiff was not disabled.

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since December 1, 2022, the alleged onset date. (ECF No. 7-1, PageID.48).

At step two, the ALJ found the following severe impairments: depression and

post-traumatic stress disorder (PTSD)/trauma disorder. (*Id.* at PageID.49).

At step three, the ALJ found none of the impairments, either independently or in combination, met or medically equaled in severity or duration the criteria of any listing. (*Id.* at PageID.50). The ALJ found Plaintiff had "mild" mental limitations in one broad area of functioning (*i.e.*, interacting with others) and "moderate" limitations in three broad areas of functioning (*i.e.*, understanding, remembering, or applying information; concentrating, persisting, or maintaining pace; and adapting or managing oneself). (*Id.* at PageID.50–51).

Next, the ALJ found Plaintiff had the RFC "to perform work at all exertional levels but with the following nonexertional limitations: she can maintain attention, concentration, persistence, and pace for performing simple job tasks with regularly scheduled breaks and can perform jobs having only occasional changes in work setting." (*Id.* at PageID.52).

At step four, the ALJ found Plaintiff had no past relevant work. (*Id.* at PageID.57).

However, at step five, the ALJ found other jobs in the national economy that Plaintiff could perform. (*Id.* at PageID.58). Specifically, the ALJ found Plaintiff could perform the requirements of a packager (71,000 jobs in the national economy), a machine off-bearer (5,000), a small products assembler (22,000), and a classifier (15,000). (*Id.*). Thus, the ALJ concluded Plaintiff was not disabled. (*Id.* at

PageID.59).

### E.    Administrative Record

Plaintiff raises two issues on appeal.  First, she argues the ALJ's determination is unsupported by substantial evidence because he did not properly consider the opinion evidence.  Second, she argues the determination is unsupported because he failed to properly consider Plaintiff's subjective testimony.  While the Court has reviewed the entire record, it will only summarize the evidence relevant to Plaintiff's issues on appeal.

### 1.    Records Predating Alleged Onset Date

In June 2021, Plaintiff had a primary care appointment where her health concerns including depression were addressed.  (ECF No. 7-2, PageID.886).  Plaintiff "[d]eclined medication" and requested a "referral to behavioral health." (*Id.*).  The provider noted: "Positive for dysphoric mood.  Negative for decreased concentration.  The patient is not nervous/anxious." (*Id.* at PageID.889 (emphasis omitted)).

The next month, Plaintiff underwent a behavioral health initial evaluation. (*Id.* at PageID.939).  The provider noted that Plaintiff was oriented times three (person, place, and time); had appropriate appearance and affect/mood; had intact memory and thought; and had normal speech, judgment, and insight.  (*Id.*). Plaintiff's previous mental health treatment was limited to "intermittent outpatient

follow-up." (*Id.* at PageID.940).  Plaintiff's prognosis was rated as good and it was recommended that she "engage in 12 individual psychotherapy visits on a weekly to biweekly basis over the course of 6 months." (*Id.* at PageID.941).  Also that month, Plaintiff returned to her primary care provider (PCP) to address gynecological concerns and the PCP noted the following: "Pt. [s]truggling with depression but declines medication at this time.  She just isn't feeling herself.  Tired, unmotivated and weight gain.  Tearful in office." (*Id.* at PageID.952).  The PCP discussed medication again, which Plaintiff said she would consider, and also recommended counseling.  (*Id.* at PageID.954).

On October 12, 2021, Plaintiff underwent an assessment at CMH of West Michigan to determine her eligibility for mental health services.  (*Id.* at PageID.773–93).  Plaintiff reported "struggling with acute PTSD" from a 2016 event, not feeling like herself, an inability to hold a job, and fear due to her belief that "she pushes everyone away." (*Id.* at PageID.774).  The 2016 event was described as follows:

> [Plaintiff] reports she was seeing someone who was married and when she found out she was done with the relationship.  She reports once he put his gun to his head and told her if she leaves he is pulling the trigger.  He threatened her on many occasions.  "That scared me, I was done." After another girl asked if they were dating and she said no, he texted her the next morning and said "you'll have to live with this for the rest of your life."  She reports she even called his wife to beg to get him help.  He completed suicide.  She had no support other than her psychiatrist and God.  Her mom said, "I didn't like him anyways, get over it."

(*Id.* at PageID.789).  Plaintiff also reported difficulties with sleep and managing her

hygiene.  (*Id.* at PageID.779).

Areas of assessment included employment, social functioning, and living skills:

> Employment – [Plaintiff] reports she has had trouble keeping a job and struggles to keep up with tasks.  She reports she went to school to become a pharmacist tech and worked for 17 years.  She reports she made it up the ladder in Flint, MI and had her own pharmacy cubicle.  She reports with finding her faith she was led away from pharmaceuticals.  She reports something acute happened leading to PTSD and she has not felt like the same person since.  She has gone to job interviews, gets jobs, and is unable to keep it past two days.  [Plaintiff] reports she has had six jobs in the past two years.

> Social Functioning – [Plaintiff] shared she used to be a people person.  She doesn't have any friends or social relationships anymore.  She explains that it has gotten worse and has escalated over the last two years.  She reports she finds that she feels safe at home, like Rapunzel.  "I don't really trust people."

> Living Skills – [Plaintiff] reports she is excellent at skills including cleaning, cooking, and managing money, however she has not been doing it.  She shared she will get up in the morning and clean up, vacuum.

(*Id.* at PageID.776).  The assessor noted that Plaintiff needed "to address anxiety [and] depressive symptoms which have led to decompensation in self-care" and Plaintiff reported a need "to increase self-esteem."  (*Id.* at PageID.785).  Plaintiff's depression screening indicated she had severe depression.  (*Id.* at PageID.788).  The assessor believed Plaintiff needed "to address significant past trauma" and recommended she engage in therapy to do so.  (*Id.* at PageID.789).

Ultimately, the assessor diagnosed Plaintiff with PTSD, providing:

[Plaintiff] reports history of complex trauma in which she has experienced physical, social, and emotional abuse.  She reports recurrent, involuntary and intrusive distressing memories of the events, displays avoidance of stimuli associated with traumatic events and experiences negative alterations in cognitions and mood associated with traumatic events which began or worsened after events occurred including persistent negative emotional state and diminished interest in activities, marked alterations in arousal and reactivity including, problems with concentration, hypervigilance, and sleep disturbance. These symptoms cause clinically significant distress or impairment in social, occupational, or other important areas of functioning.

(*Id.* at PageID.791).   The assessor opined that Plaintiff would benefit from the following treatment approaches:

1) Engagement in individual therapy to address trauma and depressive symptoms.  She is recommended to engage in EMDR.

2) Engagement in skill building to develop strategies for mood regulation, especially to utilize in times of distress.

3) Engagement in education regarding healthy relationships, including identification of characteristics of healthy relationships, boundary setting, and assistance in forming healthy, supportive relationships.

4) Linking and coordination with internal and external resources which supports recovery.  This may include accessing resources to support needs for housing, basic needs such as food, and employment.  She reports she has attempted to work with True North in the past and may benefit from advocacy in regard to utilizing resources.

5) She may benefit in engagement in medication management, however, at this time she would like to limit medications that are prescribed.

6) Establishing an ongoing working safety/support plan which can been effective and utilized during times of crisis.

7) Assessing and monitoring symptoms and their impact on overall functioning, while providing the most appropriate interventions to

achieve improvement of symptoms and recovery.

(*Id.* at PageID.793).

A week later, Plaintiff had an appointment at CMH to create a treatment plan.

(*Id.* at PageID.755).  Plaintiff reported:

> "I want to feel joy and happy and be bubbly [me] again.  I used to be
> that way.  I want to be able to be independent.  I want to be able to work
> again without that fear."  She also noted, "If anything I need to learn
> self-worth."  [Plaintiff] moved to the Ludington area around two years
> ago and is relatively new to the area and reports needing assistance with
> being linked with resources.  [Plaintiff] has experienced extensive
> trauma throughout her life including sexual assault, physical assault,
> harassment in the workplace, possibly spiritual abuse.  [Plaintiff] shares
> she wants to work and has made many attempts at working over the
> past several years but after a few days of employment her symptoms
> increase and she experiences a decrease in sleep, has nightmares,
> feelings she will pass out, lack of concentration, and doesn't find joy.
> She reports having 8–9 jobs in the last four years which she has all quit
> or walked out on due to her mental health.  She reports she needs some
> severe healing from her trauma and emotions before she can
> successfully hold down a job but shares her financial strain without
> work causes her to have increased stress along with her mental health
> symptoms.  She reports she does have hope she can heal and make
> improvements.  [Plaintiff] shares she would eventually like to own her
> own home and a reliable vehicle but without being able to hold down a
> job [these] are future areas to explore once [she] is more stable with
> income.  [Plaintiff] also shares she's gained 100 pounds over the past
> year related to her emotional stress and smoking around a pack every 1
> to 1.5 days but notes she smokes outside and is open to reducing this;
> no specific goals/objectives at this time with treatment focused more
> towards her trauma and emotions.  [Plaintiff] would like to explore
> treatment without medication management at this time but is aware this
> may be requested in the future.  She is eager to work with her treatment
> team to address her trauma, depression and emotional outbursts causing
> her to have multiple daily crying spells and reports having zero good
> days a week.  [Plaintiff] does currently take medications for seizures
> and reports having a good relationship with her medical providers

recently completing blood work; she declines to participate in the health screening and assessment.

(*Id.*).  Several treatment needs were identified, including the need "to address significant past trauma" for which therapy was recommended and the need for

> assistance in navigating employment.  She needs to address trauma which prevents success in the workplace as reminders have prevented her from continuing with employment and she will benefit from learning skills to utilize when in distress.  [Plaintiff] needs to develop healthy relationships within her community and learn to recognize characteristics of healthy relationships.  [Plaintiff] needs to secure safe housing.  [Plaintiff] needs to address depressive symptoms which have led to decompensation in selfcare.

(*Id.* at PageID.756).

The following month, Plaintiff presented to her PCP for an appointment, complaining of fatigue, depression, and weight gain.  (*Id.* at PageID.988).  The PCP prescribed Lexapro 10 mg to treat Plaintiff's depression.  (*Id.* at PageID.989).

In December 2021, less than two months after her initial assessment, Plaintiff spoke to a provider at CMH and informed her that she would like to stop receiving services.  (*Id.* at PageID.795).  Specifically, Plaintiff "report[ed] she would like to close her case because she is feeling back to herself, obtained employment, diving deeper into the bible every day and growing in her faith."  (*Id.*).

A few months later, at a March 2022 primary care appointment, Plaintiff reported that she had not been taking her prescribed Lexapro.  (*Id.* at PageID.1044).  Plaintiff's mood and affect as well as behavior were normal, and she did not appear

"nervous/anxious." (*Id.* at PageID.1045–46). The record suggests that depression was not a major topic of discussion at the appointment, which instead focused on a persistent rash and fatigue. (*Id.* at PageID.1045).

Around six months later in September 2022, Plaintiff had a psychotherapy intake with Kathy Katke, MS, LPC where she presented with "complaints of anxiety and depression. She would like to feel better and return to a healthier level of daily functioning." (*Id.* at PageID.1170). Katke noted that Plaintiff was oriented times three (person, place, and time); had appropriate general appearance, dress, interview behavior, affect, and thought content; had unremarkable motor activity, thought process, and perception; had good insight, judgment/impulse control, and attention/concentration; had intact memory and functional status; had soft speech; and had a depressed and anxious mood. (*Id.*). Plaintiff told Katke that "she has a long history of childhood, adolescence, and intimate partner physical, emotional, sexual abuse, and neglect. She has recently moved to Gaylord to begin a new life and is currently looking for employment." (*Id.*).

Katke provided a diagnosis of "Major Depressive Disorder, Recurrent episode, Moderate, with anxious distress" with rule outs of PTSD and borderline personality disorder. (*Id.* at PageID.1171). She also created a treatment plan for Plaintiff that she estimated would take six months to complete. (*Id.* at PageID.1172). About a month later, Plaintiff canceled her return appointment, explaining that "she

will be working 5 days a week and can no longer attend counseling.  No progress towards achieving treatment goals." (*Id.* at PageID.1174).

### 2.    Records Postdating Alleged Onset Date

Despite discontinuing services in October, Plaintiff returned to Katke on December 5, 2022. (*Id.* at PageID.1175).  At that appointment, Plaintiff was oriented times three (person, place, and time); had appropriate general appearance, dress, interview behavior, and affect; had unremarkable motor activity, thought process, and perception; had fair insight and judgment/impulse control; had good attention/concentration; had intact memory and functional status; had soft, verbose speech; had preoccupied thought content; and had a depressed, anxious, and irritable mood.  (*Id.*).  Plaintiff reported that she was "ruminating daily about family problems, loss of control, shame and guilt about the past, and fears about the future." (*Id.*).  Plaintiff also reported "problems with sleep and maintaining a job." (*Id.*). Plaintiff said that had lost several jobs since her intake session and "expresse[d] concern that employment will once again distract her from taking care of herself." (*Id.* at PageID.1176).  Plaintiff had a similar appointment with Katke on December 19.  (*Id.* at PageID.1179–81).

On January 4, 2023, Plaintiff returned to Katke for a therapy session.  (ECF No. 7-2, PageID.1182).  Plaintiff was oriented times three (person, place, and time); had appropriate general appearance, dress, interview behavior, and affect; had

unremarkable motor activity, thought process, and perception; had fair insight and judgment/impulse control; had good attention/concentration; had intact memory and functional status; had soft, verbose speech; had preoccupied thought content; and had a depressed and anxious mood. (*Id.*). During the appointment, Plaintiff did not report any panic attacks but did report "[f]eelings of sadness, loneliness, isolation, and alienation." (*Id.*). On several occasions, Plaintiff expressed "[f]ears that returning to work will keep her from taking good care of herself and could possibly place her in unsafe situations." (*Id.*).

On January 19, 2023, Plaintiff presented to Mary Seger, NP PhD[1] to address her obesity, hyperlipidemia, and depression. (*Id.* at PageID.1127). Plaintiff's depression was "not controlled" and she "ha[d] been on zoloft in the past." (*Id.*). Seger prescribed Zoloft 50 mg to treat Plaintiff's depression. (*Id.* at PageID.1129). Less than a month later, Plaintiff returned to Seger for a medication review. (*Id.* at PageID.1123). The reasons for the visit were hyperlipidemia, depression, and anxiety, but Plaintiff reported that she was not taking her prescribed antidepressant (Zoloft) because she did not feel like she was depressed. (*Id.*). Seger noted

---

[1] At a November 17, 2022 appointment with Seger, Plaintiff was noted to have "[n]o anxiety, no depression, and no sleep disturbances." (ECF No. 7-2, PageID.1145). Serger's records for visits occurring on the following dates contain no mention of depression: October 28, 2022 (*id.* at PageID.1148–50); November 22 (*id.* at PageID.1141–43); December 12 (*id.* at PageID.1138–40); December 20 (*id.* at PageID.1135–37); and January 12, 2023 (*id.* at PageID.1131–34).

"depression resolved."  (*Id.* at PageID.1125).

Plaintiff had two additional appointments with Katke in January (*id.* at PageID.1187–91), before again discontinuing services on February 23, 2023 (*id.* at PageID.1192).  At that time, Plaintiff reported that "she will be leaving the area soon to begin a new life in a new community.  States she is feeling strong and doing better."  (*Id.* at PageID.1192).

During an April 20, 2023 emergency department visit for abdominal pain, Plaintiff requested to speak to a social worker to obtain mental health resources due to her stressful living situation and family conflict.  (*Id.* at PageID.1223).  She was provided with resource to obtain outpatient services.  (*Id.*).

On August 21, 2023, Plaintiff presented to Gary S. Kilpela, Psy.D., for a consultative examination.  (*Id.* at PageID.1245).  Dr. Kilpela found Plaintiff to be decently groomed with an "anxious and mildly dysphoric" affect and the ability to maintain intermittent eye-contact.  (*Id.* at PageID.1246).  Plaintiff "spoke in a normal manner and had an average fund of vocabulary."  (*Id.*).  Dr. Kilpela estimated Plaintiff to be of average intelligence with "no overt evidence of any psychotic or delusional processing" and no reports of suicidal or homicidal ideation.  (*Id.*).  Plaintiff was a "fair historian" and "did ok with dates and timelines."  (*Id.*).  Her attention span was normal, and she did not need prompting with tasks.  (*Id.*).

On testing, Dr. Kilpela found that Plaintiff's "immediate and long-term

memories were within normal limits.  Her short-term memory was fair, and her procedural memory was poor." (*Id.*).  Plaintiff did well with interpreting a proverb and working out a scenario involving a lost letter, "but had some difficulty with identifying similarities" based on given examples.  (*Id.*).

Dr. Kilpela provided the diagnoses of PTSD, major depressive disorder (recurrent, moderate), removed thyroid/parathyroid, currently underemployed, and limited social support system.  (*Id.* at PageID.1247).  He rated Plaintiff's prognosis as guarded, explaining: "Over the past 12 years she has worked part-time positions in which she appears to be 'underemployed.'  This may be due to her mental health issues preventing her from finding more adequate employment." (*Id.*).  Dr. Kilpela provided the following medical source statement:

> Her ability to understand and remember instructions is moderately impaired. Her ability to carry out instructions is markedly impaired due to PTSD.  Her ability to interact with the general public and peers is moderately to markedly impaired due to her PTSD.  Her ability to adapt to changes in a work setting is markedly impaired, adding 'change is hard for me'.  Her ability to use public transportation is mildly to moderately impaired.

(*Id.*).

On September 11, 2023, non-examining State Agency psychological consultant Bruce Douglass, Ph.D. reviewed Plaintiff's records and concluded that Plaintiff "retains the capacity to perform simple, routine tasks on a sustained basis." (*Id.* at PageID.140).  Specifically, he found that Plaintiff had adequate attention and

concentration for simple tasks, but that "[s]he might have trouble staying focused on complex tasks." (*Id.*).  He further found that Plaintiff "might be slow in adjusting to changing expectations.  She has trouble managing stress." (*Id.*).  Ultimately, he opined that "[t]he preponderance of evidence suggests that [Plaintiff] can succeed in the competitive workplace, given the above-stated restrictions." (*Id.*).

On May 16, 2024, Plaintiff had an appointment to establish care with Krista McNamara, PA-C. (*Id.* at PageID.1266).  Plaintiff reported that she was currently living in a domestic violence shelter and seeing a counselor there once a week. (*Id.*).  Upon examination, Plaintiff's cognition appeared normal, her mood anxious, her affect labile, her speech rapid/pressured, and she was hyperactive. (*Id.* at PageID.1270).  McNamara assessed Plaintiff with complex PTSD and referred her to behavioral health. (*Id.* at PageID.1271).

On June 7, 2024, Plaintiff had a telephonic appointment with Heidi Sura, LMSW, reporting that she was currently living in a domestic violence shelter and pressing charges against the man she had been renting a room from. (*Id.* at PageID.1273–74).  She "shared that she is feeling strong and capable" and using coping techniques including crying, journaling, and praying. (*Id.* at PageID.1273).  Sura told Plaintiff she could request future appointment as needed, but Plaintiff reported that "she feels comfortable with her current therapist and will continue to

work with him."[2]  (*Id.* at PageID.1274).

Other evidence is discussed as relevant below.

## F.    Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision.  42 U.S.C. § 423(d)(5)(B).  The regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, such as Plaintiff's application here, distinguish between acceptable medical sources, medical sources, and nonmedical sources.  An acceptable medical source means a medical source who is a:

(1) Licensed physician (medical or osteopathic doctor);

(2) Licensed psychologist, which includes:

   (i)    A licensed or certified psychologist at the independent practice level; or

   (ii)   A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3) Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4) Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist

---

[2] Plaintiff was presumably referring to her counselor at the domestic violence shelter.  The administrative record contains no treatment records from this counselor.

practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5) Qualified speech-language pathologist for speech or language impairments only.  For this source, *qualified* means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language Pathology from the American Speech-Language-Hearing Association;

(6) Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only . . . ;

(7) Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice . . . ; or

(8) Licensed Physician Assistant for impairments within his or her licensed scope of practice . . . .

20 C.F.R. § 404.1502(a) (2021).  A medical source is

an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law.

*Id.* § 404.1502(d).  In contrast, a nonmedical source is "a source of evidence who is not a medical source."  *Id.* § 404.1502(e).  "This includes, but is not limited to: (1) [the claimant]; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and

(4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The Social Security Administration (SSA) "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources." *Id.* § 404.1520c(a). "The most important factors [the SSA] consider[s] when evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.* § 404.1520c(c).

The first factor is "supportability." For this factor, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the opinion. In essence, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." *Id.* § 404.1520c(c)(2).

In addition, the SSA will consider the source's "[r]elationship with the claimant." *Id*. § 404.1520c(c)(3).  This factor includes analysis of:

(i)   Length of the treatment relationship.  The length of time a medical source has treated [the claimant] may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(ii)  Frequency of examinations.  The frequency of [the claimant's] visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of [the claimant's] impairment(s);

(iii) Purpose of the treatment relationship.  The purpose for treatment [the claimant] received from the medical source may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

(iv)  Extent of the treatment relationship.  The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of [the claimant's] impairment(s);

(v)   Examining relationship.  A medical source may have a better understanding of [the claimant's] impairment(s) if he or she examines [the claimant] than if the medical source only reviews evidence in [the claimant's] folder.

*Id.*

The fourth factor of the SSA's analysis is "specialization."  In making this determination, the SSA will consider

[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior

22

administrative medical finding of a medical source who is not a specialist in the relevant area of specialty.

*Id.* § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other information that "tend[s] to support or contradict a medical opinion or prior administrative medical finding." *Id.* § 404.1520c(c)(5). Other factors include "evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, [it] will also consider whether new evidence [it] receive[s] after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement,

> [b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate

23

> how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate.

*Id.* § 404.1520c(b)(1).   The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually."  *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors [the SSA] consider[s] when [it] determine[s] how persuasive [it] find[s] a medical source's medical opinions or prior administrative medical findings to be." *Id.* § 404.1520c(b)(2).  As such, the SSA

> will explain how [it] considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the claimant's] determination or decision.  [The SSA] may, but [is] not required to, explain how [it] considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when [it] articulate[s] how [it] consider[s] medical opinions and prior administrative medical findings in [the claimant's] case record.

*Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported," and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors . . . for those medical opinions or prior

24

administrative medical findings in [the claimant's] determination or decision." *Id.*

§ 404.1520c(b)(3).  The regulations clarify that the SSA is "not required to articulate

how [it] considered evidence from nonmedical sources using the requirements of

paragraphs (a)–(c) of this section." *Id.* § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider

"evidence that is inherently neither valuable nor persuasive" and "will not provide

any analysis about how [it] considered such evidence in [its] determination or

decision, even under § 404.1520c." *Id.* § 404.1520b(c).  The regulations categorize

evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other

governmental and nongovernmental entities"; "[d]isability examiner findings,"

meaning "[f]indings made by a State agency disability examiner made at a previous

level of adjudication about a medical issue, vocational issue, or the ultimate

determination about whether [the claimant is] disabled"; and "[s]tatements on issues

reserved to the Commissioner[,]" including

> (i)   Statements that [the claimant is] or [is] not disabled, blind, able
>       to work, or able to perform regular or continuing work;
>
> (ii)  Statements about whether or not [the claimant has] a severe
>       impairment(s);
>
> (iii) Statements about whether or not [the claimant's] impairment(s)
>       meet the duration requirement . . . ;
>
> (iv)  Statements about whether or not [the claimant's] impairment(s)
>       meets or medically equals any listing in the Listing of
>       Impairments . . . ;

> (v)    Statements about what [the claimant's] residual functional capacity is using [the SSA's] programmatic terms about the functional exertional levels . . . instead of descriptions about [the claimant's] functional abilities and limitations . . . ;
>
> (vi)   Statements about whether or not [the claimant's] residual functional capacity prevents [the claimant] from doing past relevant work . . . ;
>
> (vii)  Statements that [the claimant] [does] or [does] not meet the requirements of a medical-vocational rule . . . ; and
>
> (viii) Statements about whether or not [the claimant's] disability continues or ends when [the SSA] conduct[s] a continuing disability review.

*Id.* § 404.1520b(c)(3).

> The regulations also provide that
>
> [b]ecause a decision by any other governmental agency or a nongovernmental entity about whether [a claimant is] disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on [the SSA] and is not [its] decision about whether [the claimant is] disabled or blind under [SSA] rules.

*Id.* § 404.1504.   Therefore, the SSA "will not provide any analysis in [its] determination or decision about a decision made by any other governmental agency or a nongovernmental entity about whether [the claimant is] disabled, blind, employable, or entitled to any benefits." *Id.* The SSA will, however, "consider all of the supporting evidence underlying the other governmental agency or nongovernmental entity's decision that [it] receive[s] as evidence in [a] claim . . . ." *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.* § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from [the claimant's] statements (symptoms)." *Id.* § 404.1502(g). Further, "[s]igns must be shown by medically acceptable clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.* Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques," which "include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as X-rays), and psychological tests." *Id.* § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain:

> In determining whether [the claimant is] disabled, [the SSA will] consider all [the claimant's] symptoms, including pain, and the extent to which [the] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. [The SSA] will consider all [the claimant's] statements about [his or her] symptoms, such as pain, and any description [the claimant's] medical sources or

27

nonmedical sources may provide about how the symptoms affect [the claimant's] activities of daily living and [his or her] ability to work.

*Id.* § 404.1529(a).  But the SSA clarified that

statements about [the claimant's] pain or other symptoms will not alone establish that [the claimant is] disabled.  There must be objective medical evidence from an acceptable medical source that shows [the claimant has] a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and persistence of [the claimant's] pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that [the claimant is] disabled.

*Id.*  Further, "[i]n evaluating the intensity and persistence of [the claimant's] symptoms, including pain, [the SSA] will consider all of the available evidence, including [the claimant's] medical history, the medical signs and laboratory findings, and statements about how [the claimant's] symptoms affect [him or her]." *Id.*  The SSA will "then determine the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how [the claimant's] symptoms affect [his or her] ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, [it] will carefully consider any other information [the claimant] may submit about [his

or her] symptoms." *Id.* § 404.1529(c)(3).  This other information may include "[t]he information that [the claimant's] medical sources or nonmedical sources provide about [the claimant's] pain or other symptoms," such as "what may precipitate or aggravate [the claimant's] symptoms, what medications, treatments or other methods [the claimant uses] to alleviate them, and how the symptoms may affect [the claimant's] pattern of daily living," which "is also an important indicator of the intensity and persistence of [the claimant's] symptoms." *Id.*

> Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that [the claimant's] medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the objective medical evidence and other evidence, will be taken into account . . . . [The SSA] will consider all of the evidence presented, including information about [the claimant's] prior work record, [the claimant's] statements about [his or her] symptoms, evidence submitted by [the claimant's] medical sources, and observations by [the SSA's] employees and other persons.

*Id.*  Factors relevant to a claimant's symptoms, such as pain, include:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain or other symptoms;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain or other symptoms;

      (vi)    Any measures . . . used to relieve . . . pain or other symptoms.

*Id.*

The new regulations also impose a duty on the claimant: "[i]n order to get benefits, [the claimant] must follow treatment prescribed by [his or her] medical source(s) if this treatment is expected to restore [his or her] ability to work." *Id.* § 404.1530(a). Stated differently, "[i]f [the claimant does] not follow the prescribed treatment without a good reason, [the SSA] will not find [the claimant] disabled or, if [the claimant is] already receiving benefits, [the SSA] will stop paying . . . benefits." *Id.* § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)    The specific medical treatment is contrary to the established teaching and tenets of [the claimant's] religion;

(2)    The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)    Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)    The treatment because of its magnitude (e.g., open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for [the claimant]; or

(5)    The treatment involves amputation of an extremity, or a major part of an extremity.

*Id.* § 404.1530(c).

### G.    Argument and Analysis

As stated above, Plaintiff raises two issues on appeal.  She argues that the ALJ's decision is not supported by substantial evidence because he failed to properly consider (1) the opinion evidence and (2) Plaintiff's subjective testimony.  Both issues will be addressed in turn below.

At the outset, the Court notes that much of the evidence relied upon by Plaintiff predates her alleged onset date of December 1, 2022.  Most of this evidence was not summarized above because records and "[m]edical opinions that predate the disability onset date have limited relevance."  *Hardy v. Comm'r of Soc. Sec.*, No. 24-5440, 2025 WL 1292181, at *5 (6th Cir. Feb. 6, 2025); *cf. DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 414 (6th Cir. 2006) ("We recognize that evidence presented at an earlier hearing or predating the onset of disability, when evaluated *in combination with later evidence,* may help establish disability.  This is particularly true when the disabling condition is progressive." (emphasis in original)).

The relevance of such evidence is impacted by temporal proximity.  *See Marney v. Bisignano*, No. 3:24-CV-00332, 2025 WL 2793798, at *4 (E.D. Tenn. Sept. 29, 2025) ("The influence of this evidence, however, can depend on the proximity in time of the pre-onset date evidence to the alleged onset date, and whether the pre-onset date evidence can establish disability when combined with other evidence in the record.").  Other courts have suggested that evidence predating

an alleged onset date by a few months or even a couple of years could be relevant to determining whether an individual is disabled.  This is true even if the evidence is later discounted because it predates the alleged onset date.  *See id.* ("Thus, a medical opinion or evidence *from four months prior to the alleged onset of disability* that discusses Plaintiff's back pain, functional limits, and inability to do physical occupations involving standing, lifting, loading, and climbing certainly could be relevant to Plaintiff's disability determination." (emphasis added)); *Kimbleton v. Comm'r of Soc. Sec.*, No. 2:10-CV-559, 2011 WL 3584471, at *2 (S.D. Ohio Aug. 15, 2011) (holding that the ALJ should have addressed a doctor's report, "even if he discounted it due to its having been *issued a year before Plaintiff's alleged onset date*" (emphasis added)); *O'Malley v. Comm'r of Soc. Sec.*, 210 F. Supp. 3d 909, 915 (S.D. Ohio 2016) (holding that the ALJ erred by not considering a medical opinion *given more than two years before the alleged disability onset date*, when the medical opinion was "consistent" and "similar" to other limitations noted in the record).

In sum, the Sixth Circuit takes a flexible approach to determining the relevancy of records that predate an alleged onset date.  In line with this reasoning, other courts have found that records predating an onset date by a couple of years or less still warrant consideration.  As such, the Court has summarized the record evidence dating back to December 2020 above.  However, the Court does not find

the records dated earlier than December 2020 relevant enough to warrant discussion.

### 1.    Opinion Evidence

Plaintiff first argues the ALJ erred when he failed to properly consider the opinion of Dr. Kilpela.  This argument is unpersuasive.

As stated above, Dr. Kilpela provided the following medical source statement:

> Her ability to understand and remember instructions is moderately impaired. Her ability to carry out instructions is markedly impaired due to PTSD.  Her ability to interact with the general public and peers is moderately to markedly impaired due to her PTSD.  Her ability to adapt to changes in a work setting is markedly impaired, adding 'change is hard for me'.  Her ability to use public transportation is mildly to moderately impaired.

(ECF No. 7-2, PageID.1247).  When evaluating medical opinions, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [the claimant's] medical sources."  20 C.F.R. § 404.1520c(a).  An ALJ must explain his approach with respect to supportability and consistency.  *Id*. § 404.1520c(b). Here, Plaintiff is arguing that the ALJ failed to adequately explain his reasoning for finding that Dr. Kilpela's opinion was inconsistent with the record.

Under the regulations, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be."  *Id.* § 404.1520c(c)(2).  In the RFC

portion of his written decision, the ALJ provided several examples of why he found Dr. Kilpela's opinion to be inconsistent with other evidence. For instance, he explained that Plaintiff "testified and reported to Dr. Kilpela that she has panic attacks several times per week; however, such reports are not reflected in her treatment records after December 2022. She denied panic attacks at her January 2023 visits." (ECF No. 7-1, PageID.55). At the end of the RFC section, the ALJ extensively discussed Dr. Kilpela's opinion, writing:

> Examining psychologist Gary Kilpela, Psy.D. opined in August 2023 that the claimant had moderate limitations for understanding and remembering instructions, marked limitation in carrying out instructions, moderate to marked limitation in interacting with co-workers and the public, marked limitation in adapting to changes in a work setting, and mild-to-moderate limitation in using public transportation.

> The undersigned accords little persuasive value overall to Dr. Kilpela's assessment. Marked limitations in any mental functioning area is not supported by his clinical examination findings. As found by Dr. Kilpela, [she] did not appear uncomfortable and spoke in a normal manner. She was attentive throughout the examination and required no prompting to stay on task or difficulties with changing tasks. She was on time for her appointment. She had some difficulties with the serial-counting task, but otherwise evidenced normal memory and cognitive functioning and fair insight and judgment (Ex. 21F). She was on time for her appointment. The overall unremarkable findings are noteworthy given the claimant had recently relocated once again, was not receiving treatment, and was unfamiliar with Dr. Kilpela (Ex. 21F).

> *Marked limitations in any of the broad areas of mental functioning are not consistent with the longitudinal record.* The claimant reported persistent mental health symptoms, but overall demonstrated good mental functioning and stability even during periods in which she relocated and/or was not receiving treatment. Mental status evaluation

findings of counselors/therapists found no evidence or memory problems or a thought disorder, and the claimant's attention and comprehension abilities were found to be normal (Exs. 16F, 23F/10). She reported that she had good coping skills/techniques and did not seek or require escalated levels of care such as emergent or inpatient treatment that would suggest she was unable to manage her symptoms or stressors or that her overall mental functioning was markedly limited (Ex. 23F/10). Moreover, the claimant currently remains active in her daily life although she is not currently receiving treatment. She has sought and obtained new employment and engages in activities that bring her happiness, such as reading/studying the Bible and being outside (Hearing Testimony).

(*Id.* at PageID.57 (emphasis added)).

The third paragraph block quoted above not only begins with a sentence stating that any marked limitations (which were opined to be necessary by Dr. Kilpela) were "not consistent with the longitudinal record" but also goes on to explain the evidence supporting this statement. The evidence cited includes Plaintiff's treatment records and testimony at the hearing, and the ALJ did not misstate or represent the evidence. Rather, Plaintiff's argument essentially seems to be that a different reading of the record supports a finding that Dr. Kilpela's opinion is consistent with the longitudinal record. "But the relevant inquiry is whether substantial evidence supports the ALJ's decision." *Adams v. Comm'r of Soc. Sec.*, No. 23-3284, 2023 WL 6366106, at *4 (6th Cir. Sept. 28, 2023).

The Court has reviewed the record and concludes that the ALJ's finding regarding the value of Dr. Kilpela's opinion is supported by substantial evidence. Plaintiff infrequently and inconsistently obtained outpatient mental health services

during the relevant period and often reported she was doing well when she did obtain such services.   As an example, at a January 19, 2023 appointment, Plaintiff's provider prescribed Zoloft to treat Plaintiff's depression.   (ECF No. 7-2, PageID.1129).  But less than a month later Plaintiff reported that she was not taking Zoloft as prescribed because she did not feel like she was depressed.  (*Id.* at PageID.1123).   Because the ALJ supported his interpretation of Dr. Kilpela's opinion with substantial evidence, "this Court will defer to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Longworth v. Comm'r Soc. Sec. Admin.*, 402 F.3d 591, 595 (6th Cir. 2005) (citation modified).

## 2.   Subjective Symptoms

Plaintiff next argues the ALJ failed to comply with 20 C.F.R. § 404.1529 when evaluating Plaintiff's subjective symptoms.  More specifically, Plaintiff argues that the ALJ inaccurately portrayed the evidence when rejecting her hearing testimony.

At the hearing, the ALJ asked Plaintiff why she felt she was unable to work, she responded:

> Yes, because I get really bad anxiety, and to work like a 40-hour week then I get exhausted.  I'm just not who I used to be; as I get older I can see that, and I'm accepting that.  But it would be -- like if I can work part-time, that's one of my – I still want to be able to work and do something, but the 40-weeks and stuff, I just -- I get to the point where I either quit, I'm worn out mentally, physically.  I you know, and now

36

that I'm stable, I can go to a doctor and stay in one place and be able to get counseling.  You know, I've never been the same since back in 2014.  And I'm accepting that, you know, I had a significant other who was an officer that committed suicide, and I've had a really hard time dealing with that.

(ECF No. 7-1, PageID.74).  Plaintiff further testified that she was not currently taking any psychiatric medications nor seeing a therapist, but indicated that since she had recently moved, she was planning to find a new counselor.  (*Id.* at PageID.74–75).

Plaintiff said she liked to spend her time outside or reading books and that she did not watch much television.  (*Id.* at PageID.76).  In the last few years, Plaintiff had begun to find it more difficult to comprehend when reading.  (*Id.* at PageID.78).  She also indicated that her "memory is not as sharp as it was."  (*Id.*).  Plaintiff had to go home after attempting to attend a Fourth of July fireworks display because she was struggling to be around a big crowd.  (*Id.* at PageID.79).

As discussed above, the ALJ was required to evaluate Plaintiff's alleged symptoms using a two-step process; allegations alone are not sufficient to establish an impairment or disability.  *See also* SSR 16-3p, 2017 WL 5180304, at *2 (Oct. 25, 2017).  An ALJ's credibility finding about a claimant's alleged symptoms may be subject to a remand when he or she has ignored substantial record evidence or inappropriately discredited testimony without determining whether it was consistent with the medical record.  *E.g.*, *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 725–

26 (6th Cir. 2014). "[A]n ALJ's decision 'must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.'" *Murray v. Com'r of Soc. Sec.*, No. 17-cv-12586, 2018 WL 836480, at *3 (E.D. Mich. Feb. 13, 2018) (quoting SSR 16-3p, 2016 WL 1119029, at *9).

Here, the ALJ opined that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [her] statements concerning the intensity, persistence and limiting effects of these symptoms are not consistent with or supported by medical evidence and other evidence in the record." (*Id.* at PageID.54). The ALJ then explicitly "acknowledge[d] that there is some objective basis in the record for the need for mentally based work limitations." (*Id.*). He explained that Plaintiff has a history of mental impairments, seeking treatment for those impairments, and that "[m]ental status evaluation findings at times were remarkable for signs of anxiety, depression, and trauma symptoms." (*Id.*). However, he also explained that Plaintiff's "[t]herapy records from 2022 through 2023, for example, found [her] with normal motor activity, an appropriate affect with good eye contact, good attention and concentration, and fair insight and judgment despite her subjective reports of symptom[s]" and also noted that Plaintiff "was appropriately dressed and groomed"

at appointments.  (*Id.*).

The ALJ then discussed the inconsistency between Plaintiff's alleged symptoms with her reports to her treating providers, explaining:

> The longitudinal record generally reflects only routine counseling that did not continue on a regular and ongoing basis.  Although recognizing the lack of continuity of care may have been impacted by relocation, the claimant's assertions of overall worsening of symptoms and functioning over time are inconsistent with reports to treating and examining providers.  Rather, [she showed] reasonably good abilities to manage her symptoms and adapt to changes in her life.  As examples, the claimant denied depression at her February 2023 primary care visit, with the provider noting that the depression had resolved (Ex. 14F/7).  About a week later, the claimant's therapist indicated in her discharge note that the claimant was feeling strong and overall doing better (Ex. 16F/29).  The therapy records are absent for discussions regarding her reasons for leaving or changing jobs (Ex. 16F).  The claimant testified and reported to Dr. Kilpela that she has panic attacks several times per week; however, such reports are not reflected in her treatment records after December 2022.  She denied panic attacks at her January 2023 visits (Ex. 16F/19, 24, 26).  During the periods the record is absent for participation in treatment or during reported periods of heightened stress or exacerbation, the record does not show any evidence of emergent treatment or hospitalization.  At the June 2024 initial behavioral health evaluation, she did not report any specific symptoms (Ex. 23F/10).  The claimant again reported that she felt capable and strong and that she had coping techniques to use as needed (Ex. 23F/10).  Her primary concerns were finding work and housing (Ex. 23F/10).  Although encouraged to return for care as desired, the claimant does not appear to have done so as she testified she is not seeing a counselor (Hearing Testimony).
>
> The undersigned has also considered other evidence that is not consistent with the claimant's alleged degree of mental dysfunction.  The claimant is generally active in her daily life.  As indicated in the medical records, the claimant attends to her own personal and medical cares as well as the needs of her cat without the need for reminders (Exs. 5E, 8E, Hearing Testimony).  She denies issues with doing

household chores and making basic meals for herself (Exs. 5E, 8E, Hearing Testimony). The claimant is able to leave her home independently and navigate about the community either by driving herself (when she has a functioning vehicle), walking, or utilizing public transportation (Exs. 5E, 8E, Hearing Testimony). She is able to maintain friendships (Ex. 21F). The claimant is able to use money and handle her own finances (Exs. 5E, 8E, Hearing Testimony). Further noted is that the claimant is able to seek out community-based resources and advocate for her own medical and financial needs (Exs. 8F/50, 23F/10, Hearing Testimony). The claimant also participates in activities she finds enjoyable or otherwise beneficial to her well-being, such as studying/reading the Bible, journaling, and being outside (Exs. 5E, 8F/30, 21F, Hearing Testimony).

(*Id.* at PageID.54–55).

This is not a case where the ALJ failed to articulate the reasons for his findings. To the contrary, the ALJ thoroughly discussed Plaintiff's medical records and hearing testimony and explained why he discounted Plaintiff's statements regarding the intensity, persistence, and limiting effects of her symptoms. Plaintiff argues that the ALJ's summation of the record was inaccurate, and in doing so primarily relies upon records predating the alleged onset date without explaining why these years-old records are relevant to the issue of whether Plaintiff was disabled during the relevant period. As the Court explained above, it has considered records predating the alleged onset date by a couple of years, but Plaintiff has provided no reason why looking beyond 2020 to 2017 and 2018 is relevant to the issue of whether Plaintiff was disabled on and after December 1, 2022.

Ultimately, the ALJ's decision to discount Plaintiff's statements regarding her

symptoms is supported by substantial evidence. *See Longworth*, 402 F.3d at 595 ("The substantial evidence standard is met if a reasonable mind might accept the relevant evidence as adequate to support a conclusion." (citation modified)). A reasonable mind could review the evidence in this case and come to the conclusion that although Plaintiff suffered from mental health issues, she often had substantial treatment gaps, did not consistently take prescribed psychiatric medications, and did not complete treatment plans created by her mental health providers, which suggests her impairments were not as severe as she claimed—let alone disabling. *See Sherrill v. Kijakazi*, No. 22-CV-2325, 2023 WL 2772126, at *3 (W.D. Tenn. Apr. 4, 2023) ("A reasonable mind might have agreed with Dr. Griffen that Sherrill was always dealing with schizophrenia and that Sherrill's inability to take his medications consistently was caused by his condition. A reasonable mind might also have concluded, as the ALJ did, that the mental acuity Sherrill demonstrated while at FCS was more probative of his ability to retain a job. The ALJ's decision is supported by substantial evidence and was made pursuant to proper legal standards."); *Kimberly Ann J. v. Comm'r of Soc. Sec.*, No. 22-12397, 2024 WL 1699496, at *4 (E.D. Mich. Mar. 7, 2024) ("Plaintiff's denial of prescribed medications and treatment does not, on its own, make those symptoms disabling. But it is a valid consideration for the ALJ in assessing whether Plaintiff's impairments preclude her from working."); *see also* 20 C.F.R. § 404.1530(b) ("If you do not follow the

prescribed treatment without good reason, we will not find you disabled."). A reasonable mind could also find that Plaintiff's testimony that she could perform household chores and enjoyed reading, spending time outside, and engaging with her Christian faith to be inconsistent with the severity of her alleged symptoms. *See Gasiewski v. Comm'r of Soc. Sec.*, No. 4:22-CV002194, 2023 WL 5673034, at *13 (N.D. Ohio Aug. 14, 2023), *report and recommendation adopted*, 2023 WL 5671936 (N.D. Ohio Sept. 1, 2023) ("Consistent with SSR 16-3p the ALJ found Gasiewski's statement concerning the intensity, persistence, and limiting effects of her symptoms conflicted with objective medical evidence, the conservative nature and effectiveness of her treatment regime, and her daily activities."); *Hunter v. Comm'r of Soc. Sec*, No. 1:17–cv–0405, 2017 WL 8219090, at *14 (N.D. Ohio Dec. 22, 2017) (holding ALJ's credibility analysis was supported by substantial evidence where Plaintiff's daily activities included cleaning, cooking, watching TV, shopping for groceries, helping boyfriend with babysitting, and where treatment of mental health impairments had been "routine and conservative"), *report and recommendation adopted*, 2018 WL 1281790 (N.D. Ohio Mar. 9, 2018). Accordingly, the ALJ's decision will be affirmed.

## III.  <u>ORDER</u>

In sum, the ALJ properly weighed the evidence and supported his findings with substantial evidence. While the evidence could support a different conclusion,

it is not the Court's job to re-weigh the evidence in the first instance. For these reasons, Plaintiff's motion (ECF No. 9) is **DENIED**, the Commissioner's motion (ECF No. 11) is **GRANTED**, and the ALJ's decision is **AFFIRMED**.

**IT IS SO ORDERED.**

Date: January 13, 2026                    S/PATRICIA T. MORRIS
                                          Patricia T. Morris
                                          United States Magistrate Judge